BOWLER (BEARD v.).  See Case No. 1,180.

BOWLER (CONNECTICUT MUT. LIFE INS. CO. v.).  See Case No. 3,106.

BOWLER (DUNDAS v.).  See Cases Nos. 4,- . 140 and 4,141.

## Case No. 1,736.

### BOWLEY v. GODDARD.

[1 Lowell, 154.] [1]

District Court, D. Massachusetts.  June, 1867.

SALVAGE—WHAT IS SALVAGE—WHO ARE SALVORS —OFFICERS AND CREW—COMPENSATION.

1. A steamer was engaged by the underwriters' agent to go to a vessel in distress with the understanding that her time and services should be liberally paid for if they were accepted and were successful, which they were. Held, the agreement was for salvage.

[Cited in Baker v. Hemenway, Case No. 770.]

2. A steamer was owned by the underwriters of Boston and was usually employed on salvage duty by special contract. Her officers and men were paid by the month, and had no right to demand more than their regular pay if they performed salvage services. Held, these facts constituted no answer to a demand for compensation reckoned upon the liberal basis of salvage, by the steamer when she was engaged to perform a salvage service by a ship not underwritten by the owners of the steamer, and without any special contract.

3. As between a ship so saved and the officers and crew of such a steamer, the latter are volunteers though paid by the month.

4. The value saved is not a very important element in awarding salvage when the danger is not immediate, and the situation of the saved vessel is such that other assistance might proba-

[1] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

bly have been rendered if that of the actual salvors had not been accepted.

[See The George Gilchrist, Case No. 5,333; The Cheeseman v. Two Ferry-Boats, Id. 2,-633.]

5. On a value of $160,000, $5,500 awarded to the two steamers.

In admiralty. The ship Coringa on her voyage from Calcutta to Boston with a very valuable cargo,—ship, freight, and cargo being worth about $160,000,—lost her rudder head when near Cape Cod, and became nearly or quite unmanageable. Her master brought her to anchor off Nauset light, about two miles from the beach, on the morning of Monday, the seventh of January, 1867, and set his colors union down. He refused the offer of the steamer Roman, of the Boston and Philadelphia line of packets, to tow him in, because the master would not disclaim salvage. In the course of the forenoon the underwriters' agent at Provincetown learned that there was a vessel in distress, and engaged the steamer George Shattuck to go to her assistance. This steamer plies between Boston and Provincetown twice a week each way, as a freight and passenger steamer, and sometimes tows vessels. The wind was so high from the northward and westward that the regular trip of the Shattuck had been postponed, and her master was disinclined to go to the assistance of the Coringa, but was induced to do so by a representation that life might be in peril. The underwriters' agent, with a whale-boat and some hands hired for the occasion, in addition to the crew and equipment of the steamer, went in her. They found the ship soon after dark on Monday, and were asked by the master to lie by him, to which they consented. The wind continued to blow so strongly for nearly two days that the steamer was not thought adequate to tow the Coringa to a port of safety, and she lay by, with fires banked, ready to give what aid she could in any emergency, and to tow the ship when the weather should moderate. In the afternoon of Wednesday, some forty-four hours after the arrival of the Shattuck, the powerful tug-boat Charles Pearson, owned in whole or in part by the insurance companies of Boston, and generally known as the underwriters' boat, came in sight, towing the dismasted bark Suliot from Provincetown to Boston. At the request of the master of the Coringa, this tug after some hesitation undertook to tow the ship. The George Shattuck assisted, and all four vessels were made fast together, and proceeded towards Boston in the following order: the George Shattuck, the Charles Pearson, the Coringa, the Suliot. The wind increased again and for some hours after nightfall, while going from Highland light to Race point, their progress was very slow. At last the bark parted the hawser by which she was made fast to the ship, and struck adrift. The steamers put back and found her in danger

of going ashore, and the George Shattuck then made fast to the bark and brought her to Boston, while the Charles Pearson brought up the Coringa; and both arrived in safety during the forenoon of Thursday.

The owners, officers, and crews of the two tugs joined in this libel as alleged salvors of the ship and cargo. The owners of the property set up that the contracts were for towage services only. Mr. Smith, the underwriters' agent, called by the libellants, stated in his cross-examination that the arrangement with the master of the George Shattuck was, in substance, that the steamer should be liberally rewarded for her time if her services were actually used and were successful, and his understanding appeared to be that the precise amount of this reward should be for the underwriters to determine. He said further, that the insurance companies of Boston had furnished him with a sum of money to be invested in this steamer when she was built, and that he has always owned a small share in her, and that his arrangement with the managing owner and with the master when he took this interest in the steamer was, that he should be at liberty to employ her on salvage service at something less than salvage remuneration. The master and managing owner denied that there was any general arrangement or understanding of this sort, and the master denied that there was any special arrangement in this case. The officers and crew of the Charles Pearson were hired by the month, and their contract required them to perform duty in saving vessels, without further or other compensation. The steamer usually made a special contract in each case for payment by the day, the hour, or the job; and when this has not been done, her services have usually been settled for upon similar principles, that is to say, upon a consideration of her services, expenses, risk, &c., rather than upon a basis of salvage in any more enlarged sense. The master of the Coringa made no bargain with either steamer; but he testified that Mr. Smith informed him on Wednesday morning that he had engaged the George Shattuck as underwriters' agent, and that no advantage would be taken of the ship's situation; and that in asking the aid of the Charles Pearson he knew he was dealing with the underwriters' boat, and inferred that salvage would not be demanded, though his vessel was not underwritten by any of her owners.

B. R. Curtis & E. Merwin, for respondents.

The express contract in the one case, and the implied contract in the other, were for a quantum meruit compensation.

H. W. Paine, for the C. Pearson.

J. C. Dodge, for the G. Shattuck.

LOWELL, District Judge. There can be no doubt, and none is suggested, since the evidence has been put in, that the services rendered were in the nature of salvage; but

it is contended that salvage compensation is waived by the situation and acts of the parties. The presumption is, that such services were rendered for a salvage compensation; but this may be rebutted by evidence: The Versailles [Case No. 6,365]; The Independence [Id. 7014]. In the latter of these cases, Mr. Justice Curtis says, "What I decide is, that to bar a claim for salvage, where property in distress upon the sea has been saved, it is necessary to plead and prove a binding contract to be paid, at all events, for the work, labors, and service in attempting to save the property, whether the same should be lost or saved."

Tried by this test, there is no bar here, because neither steamer was to be paid unless successful. This test, indeed, is not conclusive, because there may be a contract for towage contingent, as most maritime contracts are contingent, upon the successful prosecution of the enterprise, and there may be a valid contingent contract fixing the amount of salvage; and either of these would preclude the assessment of damages by the ordinary rules of salvage. This is all that can be meant by a contract to bar salvage, for an admiralty court at the present day has undoubted jurisdiction of contracts of this kind, and such an one, if proved, would be no bar, but would only regulate the damages. The courts do not interfere with the liberty of contracting in such cases, excepting to see that it is not abused. If neither fraud, nor oppression is shown, the bargain will be upheld, though it be contingent, and be for a sum much less than the court would have awarded: The Catherine, 6 Notes Cas. Supp. xliii.; The Mulgrave, 2 Hagg. [Adm.] 77; Bondies v. Sherwood, 22 How. [63 U. S.] 214; The True Blue, 2 W. Rob. [Adm.] 176; The British Empire, 6 Jur. 608; The A. D. Patchen [Case No. 87]; The Helen and George, Swab. 368; The Enchantress, Lush. 93; Eads v. The H. D. Bacon [Case No. 4,232]. The contract must not only be fairly and honestly made, but the evidence must show a definite and explicit bargain. Mere loose talk will not do; The Salacia, 2 Hagg. [Adm.] 262. It is not unusual for masters in their laudable zeal for the interests of their owners, not only to underrate the service after it has been performed, but to fasten upon some expression of the salvors, such as that they would be reasonable in their charges, or the like, as binding them not to claim salvage. The objection to the allowance to the George Shattuck rests on such a statement; but in the evidence I find nothing which should have that operation. Granting that Mr. Smith's version of the conversation should be accepted without qualification, and that of the master should be wholly rejected, yet the engagement merely was that the steamer should be paid liberally if her services were accepted and were successful. But this must mean that the pay should be in some degree proportional to the success, because, if by great exertion and at great expense, only a small value had been saved, liberality contingent on success could not require a payment exceeding the value rescued; and the converse must hold in favor of the steamer; and this is salvage. Mr. Smith's understanding probably was, that the underwriters' estimate of liberality should be the final measure of its amount; but this cannot be accepted as a legal measure to render the contract either fair or explicit within the law. If an agreement to refer the amount to arbitrators will not bar a libel, much less would one which leaves the adverse party to be the sole judge of the controversy be such a bar. If the true construction of the conversation shows an agreement not to enhance the compensation if the ship should turn out to be a very valuable one,—and I am much inclined to think this is the real meaning of it, —that is no more than I should apply as the rule of damages in a case of this kind, for I have always considered that a vessel merely disabled, but in no immediate peril, and lying near a port from which assistance may be readily obtained, is to have the advantage of her situation, and to be presumed to take the first tug on substantially the terms that she could have had the next one for. In other words, that while such a service is salvage, and is to be compensated much more liberally than mere towage, yet, the peril not being immediate, the value saved is not so important an ingredient as in cases of more urgency. The service in such a case undoubtedly approaches much more nearly to a towage service than when the vessel is derelict at sea, or in any other desperate circumstances.

The Charles Pearson made no contract, and I am asked to infer one. I should be slow to conclude from circumstances alone, that a salvage service was undertaken for a mere quantum meruit. I recall no case in which such an implication has been made, and none has been cited. The officers and men of this steamer are paid by the month, and their wages are in full for all services of every kind. This is all that appears. Whether the pay is larger than ordinary wages, whether the contracts are binding on the men, these questions cannot be answered from the evidence before me; but this I hold to be plain, that these officers and men owed no duty to the respondents, and when they saved their property, were volunteers quoad them; what their rights may be among themselves does not concern the respondents. I cannot say that this fact bars the salvage. Nor do I see that the mode in which the managers of the steamers usually dealt with other persons constitutes an advertisement to the world that they were ready to undertake salvage services for towage wages. It is true, probably, of most tugs, that they are ready to make a bargain for any kind of service, and that from their position in a seaport town,

in the presence of an active competition, they will usually be obliged to make one or lose the employment. Still, I do not know, and am not instructed that there is any fixed rate of compensation based on anything like a mere quantum meruit. I suppose that many of these bargains must be, in effect, agreements for a fixed amount of salvage, approaching more or less nearly to what would be awarded by a court of admiralty. However this may be, this case does not find an agreement between these parties, express or implied, for mere towage. The master of the Charles Pearson could not have so understood it, because he would have had no right to undertake such a service without the consent of the master of the bark Suliot, which he already had in tow; and there is no evidence of any such assent; but in a case of salvage, he might well, under some circumstances, perhaps under these, considering the great value of the Coringa and her cargo, which appears to have been much greater than that of the Suliot, take the chances of damage to the Suliot, trusting to indemnity by way of salvage from the very valuable property in jeopardy.

I am of opinion, therefore, that both steamers are entitled to a reward, to be adjudged by a court of admiralty upon the principles governing cases of salvage. The question of amount is always nice and embarrassing. In this case, I find that the ship was not in the most imminent and pressing danger, but was lying where communication could be had, and was had, with her owners, and where assistance from other steamers might probably be availed of. It was on these grounds, no doubt, that the master refused the assistance of the steamer Roman; he had a right to consider that such a vessel, large and valuable, bound on an important voyage, with passengers and cargo, might properly demand a high rate of salvage, and being in no instant danger, he preferred to wait, if he could not make a definite bargain. I have already said that, in such a case, what may possibly be called a salvage quantum meruit, that is, a large and liberal compensation for what the work was worth to the steamer, without a very nice regard to value saved, should govern the salvage award. I find that the George Shattuck contributed nearly three days' time, with some trouble and discomfort to her crew, and some derangement, I suppose, of her ordinary business. The Charles Pearson gave a more valuable, powerful, and efficient vessel, and performed the greater part of the actual towing, but with much less time, and that already paid for, but with some risk of damage to the bark under her charge. Upon the whole circumstances, I have thought right to award to the George Shattuck three thousand five hundred dollars, and to the Charles Pearson two thousand dollars.

There was evidence that the broken hawser belonged to the ship, and was new and of some value, but how it came to be used or to be broken I am not informed, and the facts proved are not sufficient to enable me to say that the steamers, or either of them, should bear the loss. Upon this point I am willing to hear evidence before a final assessment of the damages, if any party desires it. Salvage decreed.